## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53320-1-II |
| Respondent, | |
| v. | |
| RICHARD JOHN BERTOLACCI, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Richard Bertolacci appeals his convictions for attempted rape of a child in the first degree and attempted rape of a child in the second degree following a jury trial. He argues that there was insufficient evidence to sustain the first degree conviction because he did not take a substantial step toward committing that crime, nor did he have the intent to commit that crime. Bertolacci further argues that the two convictions violate his right against double jeopardy because they were based on a single unit of prosecution. Finally, he argues that he received ineffective assistance of counsel based on his attorney's failure to argue at sentencing that the two crimes constituted same criminal conduct and his failure to request a jury instruction on entrapment.

We conclude that sufficient evidence supports the conviction for attempted rape of a child in the first degree and that the two convictions do not violate the prohibition against double jeopardy. We further conclude that Bertolacci did not receive ineffective assistance of counsel because the two crimes do not constitute same criminal conduct, and he was not entitled to an instruction on entrapment. Accordingly, we affirm.

FACTS

On March 22, 2018, Bertolacci responded to a Craigslist ad placed by Washington State Patrol Detective Sergeant Carlos Rodriguez as part of an undercover operation called, "Net Nanny." 1 Report of Proceedings (RP) at 251. The ad, placed in the "woman looking for man" section, was titled "Daddy wanted for daughter FunFamilySecrets ddlg—w4m." Clerk's Papers (CP) at 4. The body of the ad said:

> Mommy in need of Daddy for daughter. can you keep a secret?? We can. Discretion needed. Must be patient and no pain. If you think u [sic] are right for this then reply I am very selective reply with your name and favorite movie so I know you are real and not a bot. ddlg. taboo. generous a plus.

CP at 4.

> Bertolacci responded to the post:
>
> Hi I don't have a favorite movie but my name is Rich. If your [sic] still looking for a daddy, let me know and lets [sic] see if we're both on the same page. I have to agree with you I am not into any kind of pain, giving or receiving [sic]. I am WM looking to play with a steady woman. are you her? If your [sic] real I can give you more info. I would like the same from you.

CP at 5.

Detective Kristl Pohl, posing as the "mother" replied, "THis isn't for me this is for my daughters. I was raised this way by my dad and I'm looking for the same for my girls. This is very taboo. if this isn't for you, just don't judge please." CP at 5. The following exchange occurred:

> [Bertolacci]: It is not for me to judge. The only thing I would ask is how old is your daughter?? And is she willing to do it.
> [Mother]: my girls are 12 and 8 and they have experience with this that they loved. I'm very open with the girls and tell them everything.
> [Bertolacci]: Ok. Is this for a full time daddy or one that comes and goes as you need him??
> [Mother]: I would prefer full time but that is hard to find. I want them to have some consistency that they trust fully

[Bertolacci]: I understand the full time. It would be better if they had someone around that they could put their trust in. So basically your [sic] saying it would be like a foursome at times???

[Mother]: I wouldn't be involved except to make sure the girls are safe and having fun. I want them to have their own special man that's just about them.

[Bertolacci]: . . . Yes iam [sic] still interested but you will have to tell me how you want it to play out. would you tell me what county you [sic] in so I know if your [sic] near or far. Thanks.

[Mother]: we are staying at a place near Port Hadlock. if your [sic] interested in continueing [sic] this then please text me 360-209-7235

[Bertolacci]: Yes I am interested otherwise I would not have written to you again. We are somewhat close to one another. I am in the Bremerton area. I prefer not to text just yet. I would like to know you better then we could proceed with the texting. would you like to meet somewhere??

[Mother]: ok well CL personals got shut down by the Feds so I'm not sure how long the emails are going to work and it makes me nervous to keep using.

CP at 89-92.

Bertolacci gave her his e-mail address and the conversation continued:

[Bertolacci]: Well I think we have the formalities out of the way. Would you still to [sic] meet. We can meet in your area if you like.

[Mother]: I'm still not sure what your [sic] interest is in this yet? not ready to meet you if I don't know

[Bertolacci]: well you mentioned taboo stuff that you said you wanted to do You were brought up that way. and you wanted your siblings to experience the same thing. I am hoping I can help you with that. with out [sic] being to [sic] explicit.

[Mother]: this is for my girls they are 12 and 8. they have some experience with a man already but he moved and they really want that again

[Bertolacci]: Well that is why I am still in contact with you. But if we get together we will have to take is [sic] slow and easy.

[Mother]: yes of course. they love being taught and have responded well in the past to slow and gentle and fun

[Bertolacci]: will you be there to show them what to do??

[Mother]: yes of course. I will be there to make sure the girls are safe and having fun

[Bertolacci]: ok I think were [sic] both on the same page.

[Bertolacci]: It is up to you now if we meet or not. If you want to know more about me just ask the questions

[Mother]: . . . what would you want to do as their teacher?

[Bertolacci]: [. . .] What would I want to do as their teacher. First off I would like to get to know them a little bit. You said they have some experience at this. So first off I would like to get them comfortable with me. I would teach them nice feelings giving and receiving.

No pain at all. I don't think there should be any pain involved. they can try that when they are older. Also to take their time and enjoy what they are doing. I think it would help if you told me how much experience they have before hand [sic]. I am very gentle

[Mother]: that sounds nice

they have both given and received oral. they both play with toys and have their own vibrators. Mandy the 12 year old has been partially penetrated but he was a little to [sic] big and they didnt [sic] push it

[Bertolacci]: Ok so they do have some experience with it. That makes it a little easier as to what to expect. I think sex is great if it is done right.

[Mother]: i agree and thats [sic] what I really want them to learn. If only all first experiences could be good. . . .

They really enjoyed the time they spent leaning [sic] with my friend before he moved over the summer.

[Bertolacci]: Is Mandy old enough to have an orgasm

[Mother]: yes she can orgasm.

[Bertolacci]: ok Sounds like she is well on her way to being a young woman

[Bertolacci]: Well Kelly I think I am going to call it a night. I am going to hit my bed. Let me know what you would like to do one way or another. Good night

[Mother]: ok hun email me tomorrow if you want to have a visit

[Bertolacci]: good morning. are you up?? Yes I would like to have a visit . . . .

[Mother]: I would like that but we need to discuss rules and expectations first hun

[Bertolacci]: Yes we need to discuss the rules. I will not overstep my boundaries You can take my word on that. You let me know what they are please

[Mother]: rules are no pain no anal and condoms are required and lube

I wont [sic] send you my address until we agree on a place for you to go close to my house and then when you send me a pic to prove your [sic] actually there i will give you my address.

CP at 94-99.

They then arranged a time for Bertolacci to drive to Port Haddock and continued:

> [Mother]: [. . .] will you be bringing condoms and lube hun? I want the girls to know what to expect from you today
> [Bertolacci]: Yes I will bring condoms and lube. Please remember I will be nervous the first time with them. But I want them to enjoy themselves I guess you told them you have a friend coming over??
> [Mother]: yes of course they know. I tell them everything. they are excited
> [Bertolacci]: Well I am a little worked up too. lol
> [Bertolacci]: I don't want to sound like a whiner but good hygiene is a must. for all I will be freshly showered. also please send me the place you want to meet me so I can put it into the GPS.

CP at 100-01.

They agreed to meet at the QFC in Port Haddock to have Bertolacci follow up for additional directions. When Bertolacci arrived at the QFC, he sent a text message to the detective posing as the "mother" saying he had arrived. The detective asked again if he brought condoms and lube, Bertolacci replied affirmatively and she gave him the address. Bertolacci arrived at the given address and entered the house. After a brief conversation with the detective in the entryway, Bertolacci was arrested. He had condoms, lubricant gel, and pills for erectile dysfunction in his possession.

Bertolacci cooperated with law enforcement and consented to a complete search of his phone, truck, and computers. The State charged Bertolacci by amended information with attempted rape of a child in the first degree and attempted rape of a child in the second degree.

At trial, Rodriguez testified that ads placed in the "Casual Encounters" section of Craigslist were known for being used to arrange "no strings attached" sexual encounters. 1 RP at 255. He also testified that the ad used specific words to indicate an interest in sex with children, including "taboo," "family fun," "family secrets," and "DDLG" which stood for "Daddy Daughter Little Girl." 1 RP at 264.

Bertolacci testified that he used Craigslist as a way to meet women. He went through the casual encounters ads daily and responded to a couple each time. He, in turn, would receive a couple of replies each week. He had been successful in the past in this way arranging rendezvous with women with whom he had sex. He also described his experience with a form of back and forth negotiations that would precede any sexual activity.

He testified that he responded to the ad thinking it was for an adult and explained that although "she" was "talking about the kids, [. . .] I was more interested in her." 2 RP at 565. He testified "I wanted to meet with her and then we could talk and negotiate and see where we'd go from there." 2 RP at 568. He claimed that he continued to pursue the mother, despite the discussion about her children, because Craigslist shut down the casual encounter section shortly after they made contact so there was no one else for him to talk with.

Finally, Bertolacci testified that when he arrived at the home, he tried to have a conversation regarding his intentions, but the undercover officer that answered the door interrupted and said "let me go get the kids." 2 RP at 571. He maintained that he wanted to "talk about this first" and as she started to walk away, Bertolacci tried to grab her so they could talk, but "she kept going and by that time, everybody jumped out." 2 RP at 571-72.

The jury received the following relevant instructions:

> To convict the defendant of the crime of Attempted Rape of a Child in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 24th day of March, 2018, the defendant did an act that was a substantial step toward the commission of Rape of a Child in the First Degree;
> (2) That the act was done with the intent to commit Rape of a Child in the First Degree; and
> (3) That this act occurred in the State of Washington, County of Jefferson.

CP at 52 (Instr. 13).

> A person commits the crime of Rape of a Child in the First Degree when that person has sexual intercourse with [a] child who is less than twelve years old and who is not married to the person and is not in a state registered domestic partnership with the person and who is at least twenty-four months younger than the person.

CP at 46 (Instr. 7).

Defense counsel did not propose an instruction on entrapment. The jury found Bertolacci guilty on both counts.

Believing that Bertolacci was entitled to an entrapment defense based on recent court of appeals decisions, his defense counsel moved for a new trial pursuant to CrR 7.5(a)(8) based on his failure to request an instruction on entrapment. The court denied the motion after determining that Bertolacci was not entitled to an entrapment instruction.

Bertolacci appeals.

## ANALYSIS

I.  INSUFFICIENT EVIDENCE

Bertolacci argues that there was insufficient evidence to sustain his conviction for attempted rape of a child in the first degree. He asserts that the evidence failed to establish that he took a substantial step toward committing the crime, and that the evidence is insufficient to prove he intended to engage in sexual intercourse with the fictitious eight-year-old child. We disagree.

A.  Legal Principles

The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). "'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *Id*. (quoting *State v. Salinas*, 119 Wn.2d

192, 201, 829 P.2d 1068 (1992)). We defer to the trier of fact on issues of credibility of witnesses and the persuasiveness of the evidence. *Thomas*, 150 Wn.2d at 874-75.

A conviction for attempted rape of a child in the first degree requires proof that the defendant took a substantial step toward having sexual intercourse with a child less than 12 years old and when the defendant is at least 24 months older than the victim. RCW 9A.28.020(1); RCW 9A.44.073[1]; *State v. Johnson*, 173 Wn.2d 895, 904, 270 P.3d 591 (2012). It also requires proof that the defendant intended to commit the crime of rape of a child in the first degree. *Johnson*, 173 Wn.2d at 904. In this context, the intent required for attempted rape of a child is the intent to have sexual intercourse. *Id*.

"Sexual intercourse" is defined as any penetration however slight, or any sexual contact between one person's sex organs and the mouth or anus of another. RCW 9A.44.010(1)(a), (c). "Sexual contact" is defined as any touching of the sexual or other intimate part of a person done for the purpose of gratifying sexual desire. RCW 9A.44.010(2).

A substantial step is an action "'strongly corroborative'" of the defendant's criminal purpose. *Johnson*, 173 Wn.2d at 899 (quoting *State v. Luther*, 157 Wn.2d 63, 78, 134 P.3d 205 (2006)). "Mere preparation to commit a crime is not an attempt." *State v. Wilson*, 1 Wn. App. 2d

---

[1] At the time of Bertolacci's conviction, former RCW 9A.44.073 (1988) provided that:

> (1) A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim.
> (2) Rape of a child in the first degree is a class A felony.

Effective April 26, 2021, the Washington State Legislature amended former RCW 9A.44.073 by removing "and not married to the perpetrator" from subsection (1) of that statute. LAWS OF (2021), ch. 142, § 2. Because the amendment does not apply the facts of this case, we use the current version of RCW 9A.44.073.

73, 83, 404 P.3d 76 (2017). "But '[a]ny slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime.'" *Id.* (quoting *State v. Price*, 103 Wn. App. 845, 852 14 P.3d 841 (2000)).

Conduct that may be indicative of a substantial step includes physically traveling to the place where the crime may be committed. *State v. Townsend*, 105 Wn. App. 622, 631-32, 20 P.3d 1027 (2001). Once a substantial step is taken, the crime of attempt occurred. *State v. Workman*, 90 Wn.2d 443, 450, 584 P.2d 382 (1978).

B.      Discussion

1.      Intent

Bertolacci argues primarily that there is a lack of evidence showing his intent to have sex with the younger child. He argues that intent was not established by his conversation with the "mother" because he never said he wanted to have sex with the younger child, and that child was only mentioned in passing and not by name.[2]

Although the child was never mentioned by name, the conversation between Bertolacci and the mother continuously refers to both daughters. First, Bertolacci referred to the "taboo stuff that you said you wanted to do" and said that he was "hoping [he could] help [her] with that." CP at 94. When the detective reiterated that "this is for [her] girls they are 12 and eight" he responded, "[W]ell that is why I am still in contact with you. But if we get together we will have to take is

---

[2] Bertolacci also appears to assert that the claimed lack of intent equates to a lack of a substantial step but fails to support his assertion with argument. We will not consider arguments unsupported by analysis. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012) ("Such '[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" (quoting *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998)); *see also* RAP 10.3(a)(6). Moreover, while evidence may speak to both, "intent" and "substantial step" are two different elements of attempt. *See* RCW 9A.28.020. Bertolacci's reduction of these two issues into one is misplaced.

[sic] slow and easy." CP at 95. Implicit in his response is that he agreed to sexual contact with both girls.

Next, when the detective asked what Bertolacci would want to do as their teacher, he responded that first he "would like them to get comfortable with [him]. [He] would teach them nice feelings giving and receiving. No pain at all." CP at 96. He then continued that he believed it would help if he knew "how much experience they have before hand [sic]." CP at 96. The detective replied that "[T]hey have both given and recieved [sic] oral. [T]hey both play with toys and have their own vibrators." CP at 96. Bertolacci responded, "Ok so they do have some experience with it. That makes it a little easier as to what to expect. I think sex is great if it is done right." CP at 96. Again, Bertolacci's response implies that he is in agreement with all that has been said prior; he confirms his satisfaction with their experience and confirms that the fictional girls' sexual experiences fit within his expectations for the sexual encounter with them.

Finally, Bertolacci said to the detective that he "would like to have a visit." CP at 98. She responded that they needed to discuss rules and expectations, to which Bertolacci replied that he would not overstep his boundaries, and that she should let him know what they are. Her rules were "no pain [and] no anal and condoms are required and lube." CP at 99.

The conversation, especially the use of "they" and "them" indicates that Bertolacci and the "mother" are referring to both girls while discussing their experience, expectations, and rules for the visit. When viewing the evidence in a light most favorable to the State any rational trier of fact could find beyond a reasonable doubt that Bertolacci had the requisite intent—to have sexual intercourse with *both* girls, including the fictional eight year old.

10

2. Substantial Step

Bertolacci further argues that he did not take a substantial step toward sexual intercourse with regard to the eight year old. We disagree. Bertolacci took actions that any rational trier of fact could find are strongly corroborative of his intent.

After discussing the "rules and expectations" of the visit, the detective requested that he bring condoms and lubricant. Bertolacci responded, "Yes I will bring condoms and lube. Please remember I will be nervous the first time with them. But I want them to enjoy themselves." CP at 100. The detective stated that "[t]hey are excited" to which Bertolacci replied, "Well I am a little worked up too. lol." CP at 100. He followed the detective's instructions and arrived at the house with condoms, lubricant, and a packet of pills for erectile dysfunction. Any rational trier of fact could find that the pills for erectile dysfunction were needed so that he could form an erection and engage in sexual contact up to and including intercourse. Bringing condoms and lubrication to the meeting is also evidence that is strongly corroborative of his criminal purpose, as lubrication would facilitate his penetration of the girls, while condoms would protect both him and the girls from sexually transmitted diseases.

When viewing the evidence and all reasonable inferences in a light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Bertolacci took a substantial step toward having sexual intercourse with the fictitious eight-year-old child. We conclude that sufficient evidence supports his convictions on the charges involving both children.

II. DOUBLE JEOPARDY

Bertolacci argues that his two convictions for criminal attempt violate double jeopardy because they are based on a single unit of prosecution. Recognizing that the unit of prosecution rule applies only in cases where the defendant was convicted of violating a single criminal statute,

Bertolacci contends that he was convicted, in both counts, of violating RCW 9A.28.020, the statute that describes liability for inchoate crimes.

A defendant may face multiple charges arising from the same conduct, but double jeopardy forbids entering multiple convictions for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *State v. Freeman*, 153 Wn.2d 765, 770-01, 108 P.3d 753 (2005). Whether or not a defendant faces multiple convictions for the same crime generally turns on the unit of prosecution. *State v. Westling*, 145 Wn.2d 607, 610, 40 P.3d 669 (2002).

However, we disagree that Bertolacci was convicted of multiple violations of a single criminal statute; the two crimes for which he was convicted are not the same. The first count was attempted rape of a child in the first degree, which required the State to prove that he took a substantial step toward having sexual intercourse with a child less than 12 years old. RCW 9A.28.020(1); RCW 9A.44.073. The second was attempted rape of a child in the second degree, which required the State to prove that Bertolacci took a substantial step toward having sexual intercourse with a child who is at least 12 years old but less than 14 years old and that the perpetrator is at least thirty-six months older than the victim. RCW 9A.28.020(1); RCW 9A.44.076(1)[3]. Although both counts were under the criminal attempt statute, the underlying

---

[3] At the time of Bertolacci's conviction, former RCW 9A.44.076 (1990) provided that:

> (1) A person is guilty of rape of a child in the second degree when the person has sexual intercourse with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim.
> (2) Rape of a child in the second degree is a class A felony.

Effective April 26, 2021, the Washington State Legislature amended former RCW 9A.44.076 by removing "and not married to the perpetrator" from subsection (1) of that statute. LAWS OF (2021), ch. 142, § 3. Because the amendment does not apply the facts of this case, we use the current version of RCW 9A.44.073.

crimes were different for each count. The criminal attempt statute, while referencing the same inchoate nature of these crimes, does not convert the two separate underlying crimes into the same crime; this argument is meritless.

Because Bertolacci's double jeopardy claim is confined to his argument that he was twice convicted of violating a single criminal statute for which there was only one unit of prosecution, and because we hold that Bertolacci was in fact convicted of violating two separate criminal statutes, his double jeopardy claim fails.

III.     INEFFECTIVE ASSISTANCE OF COUNSEL

Bertolacci argues that he received ineffective assistance of counsel because his trial counsel failed to argue that two of his convictions were the same criminal conduct for the purpose of sentencing. He contends that he was prejudiced because his counsel's failure to argue the issue resulted in him receiving a higher sentence. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both that defense counsel's representation was deficient and that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. If either prong is not satisfied, the defendant's claim fails. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004). "Deficient performance is performance falling 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *State v. Kyllo*, 166 Wn.2d 856,

862, 215 P.3d 177 (2009) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). When a defendant is convicted of multiple crimes, each conviction is treated like a prior conviction for purposes of calculating the defendant's offender score unless the crimes constitute the "same criminal conduct." RCW 9.94A.589(l)(a). A defendant claiming same criminal conduct must prove to the sentencing court that his other current offenses "'require the same criminal intent, are committed at the same time and place, and involve the same victim.'" *State v. Graciano*, 176 Wn.2d 531, 536, 295 P.3d 219 (2013) (quoting RCW 9.94A.589(1)(a)).

If the defendant demonstrates that the other current offenses encompass the same criminal conduct, the sentencing court counts those current offenses as one crime. RCW 9.94A.589(1)(a); *Graciano*, 176 Wn.2d at 536. The parties only disagree as to whether the crimes involved the same victim. Specifically, at issue is whether there can be more than one victim if the victims are fictional.

Recently Division I of this court considered the same argument by a defendant who was charged with two counts of attempted molestation of a child in the first degree based on an almost identical sting operation where law enforcement posed as a mother seeking a "daddy" for her eight- and eleven-year-old daughters. *State v. Canter*, ___ Wn. App. ___, 487 P.3d 916, 917 (2021) (published in part). In that case, the defendant argued, as Bertolacci does here, "his crimes involved the 'same victim' because a 'fictitious' victim is 'no victim' under RCW 9.94A.030(55)." *Id*. at 922. The court disagreed. *Id*. at 923.

The court reasoned that "[a]n attempt conviction stems from 'the defendant's "bad intent" to commit the crime and the fact that had things been as the defendant believed them to be, he or she would have completed the offense." *Id*. (quoting *Luther*, 157 Wn.2d at 73). In that case, if the situation had been as the defendant believed it to be, he would have had sexual contact with

two separate girls and he intended to inflict injury on two different victims. Thus, the court concluded that because "[c]rimes affecting more than one victim cannot encompass the same criminal conduct," the defendant's argument failed. *Canter*, 487 P.3d at 923.

Similarly here, there are two separate girls and the jury found that he intended to inflict injury on two different victims. At the time of Bertolacci's sentencing, there was no authority to support distinguishing fictional and real victims. In fact, the criminal provision at issue specifically provides that impossibility is not a defense to this crime. RCW 9A.28.020(2); *Johnson*, 173 Wn.2d at 900-01.

Failure to argue a theory unsupported by law is not conduct that falls below an objective standard of reasonableness, and thus counsel's representation was not deficient. Additionally, even if counsel would have made such an argument, the court could not have found that the crimes were the same criminal conduct, so Bertolacci cannot show prejudice. Bertolacci fails to show that he received ineffective assistance from his attorney.

IV.    MOTION FOR A NEW TRIAL

Bertolacci argues that the court abused its discretion by denying his motion for a new trial based on his counsel's failure to request an entrapment instruction. He contends that his attorney's decision was below the standard of care because it was based on a misunderstanding of the legal standard rather than based on tactics or strategy. He also asserts that it prejudiced his right to present a defense. Because Bertolacci was not entitled to an entrapment instruction, we conclude that the court did not abuse its discretion in denying the motion.

A.    Legal Principles

Under CrR 7.5(a)(8), a trial court may grant a new trial when "substantial justice has not been done." Ineffective assistance of counsel may constitute substantial injustice. *State v.*

*Dawkins*, 71 Wn. App. 902, 907, 911, 863 P.2d 124 (1993). We review a trial court's denial of a CrR 7.5 motion, including one brought on the basis of ineffective assistance of counsel, for an abuse of discretion. *Id*. at 906-07. A trial court abuses its discretion only when no reasonable person would take the position adopted by the trial court. *State v. Bessey*, 191 Wn. App. 1, 6, 361 P.3d 763 (2015).

As discussed above, to prevail on a claim of ineffective assistance, the defendant must show both that defense counsel's representation was deficient in that it fell below an objective standard of reasonableness, and that the deficient representation prejudiced him. *Grier*, 171 Wn.2d at 32-33; *Kyllo*, 166 Wn.2d at 862. Prejudice occurs where "there is a reasonable probability that, but for the deficient performance, the outcome of the proceedings would have been different." *Id*. at 862.

Specifically, ineffective assistance of counsel based on the failure of trial counsel to request a jury instruction requires us to find that the defendant was entitled to the instruction, that counsel's performance was deficient in failing to request the instruction, and that the failure to request the instruction prejudiced the defendant. *State v. Johnston*, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007).

The defense of entrapment is codified in RCW 9A.16.070, which states,

> (1) In any prosecution for a crime, it is a defense that:
> (a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and
> (b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.
> (2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.

As an affirmative defense, the defendant bears the burden of proving entrapment by a preponderance of the evidence. *State v. Lively*, 130 Wn.2d 1, 13, 921 P.2d 1035 (1996) ("Defendants should ultimately be responsible for demonstrating that they were improperly

induced to commit a criminal act which they otherwise would not have committed.").  The use of a "normal amount of persuasion to overcome the defendant's expected resistance" is not entrapment.  *State v. Trujillo*, 75 Wn. App. 913, 918, 883 P.2d 329 (1994).  "In order to show entrapment, a defendant must show more than mere reluctance on his or her part to violate the law."  *Id*.

There is a split in the court of appeals regarding the amount of evidence the defendant must present in order to be entitled to an instruction on entrapment.  In *Trujillo*, Division I rejected the typical "some" or "substantial" evidence standard for obtaining instruction on an affirmative defense, instead holding that "to entitle a defendant to an entrapment instruction . . . a defendant must present evidence which would be sufficient to permit a reasonable juror to conclude that the defendant has established the defense of entrapment by a preponderance of the evidence."  *Id*. at 917.  This court applied the same standard, for example most recently in *State v. Racus*, 7 Wn. App. 2d 287, 302-03, 433 P.3d 830 (published in part) (noting that *Racus*, No. 49755-7-II, slip op. (unpublished portion) at 19 n.9, https://www.courts.wa.gov/opinions/pdf/497557.pdf, cites to *State v. Galisia*, 63 Wn. App. 833, 822 P.2d 303 (1992), for the proposition that only "some evidence" is needed to be introduced in order to support instructing the jury on entrapment, but concluding that *Galisia* was abrogated by *Trujillo* on that issue), *review denied*, 193 Wn.2d 1014 (2019).

But Division III, in *State v. Arbogast*, recently rejected the standard in *Trujillo*, concluding that there was no basis for that court to adopt a heightened standard.  15 Wn. App. 2d 851, 871, 478 P.3d 115 (2020), *review granted*, 197 Wn.2d 1007 (2021).  Instead, the court applied the

"substantial" or "some" evidence standard.[4] *Id*. at 873 ("[Defendant] was entitled to instruction on entrapment by presenting prima facie evidence of the defense."). This decision is pending review by the Supreme Court.

B.      Discussion

In arguing before us that he was lured or induced to commit the crime, Bertolacci argues first that he made it clear that he was looking for an adult woman, and it was the detective who set the tone and subject of the conversation and "pushed the fictional daughters" on him. Supp. Br. of Appellant at 7. He also contends that the detective conditioned their meeting on his "taking on a mentorship position with the children" and thereby "ha[d] offered not merely an opportunity, but an inducement sufficient to entitle him to an entrapment instruction." Supp. Br. of Appellant at 7-8.

Bertolacci fails to show that he was entitled to an entrapment instruction under either the "some credible evidence" standard articulated in *Arbogast*, or the more burdensome standard articulated in *Trujillo*.

In support of his argument that he should receive a new trial, Bertolacci cited to *State v. Chapman*, No. 50089-2-II (Wash. Ct. App. Jan. 23, 2019) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2050089-2-II%20Unpublished%20Opinion.pdf, and *Racus*, 7 Wn. App 2d. 287, as decisions that "led [the attorney] to believe Mr. Bertolacci had a

---

[4] "'The trial court is justified in denying a request for [an affirmative defense] instruction only where no credible evidence appears in the record to support [it].'" *State v. Fisher*, 185 Wn.2d 836, 849, 374 P.3d 1185 (2016) (alterations in original) (quoting *State v. McCullum*, 98 Wn.2d 484, 488, 656 P.2d 1064 (1983) (plurality opinion)). In evaluating a defendant's evidence in support of an affirmative defense, the trial court must view it in the light most favorable to him. *Fisher*, 185 Wn.2d at 849. Failure to give instruction on an affirmative defense to which the defendant is entitled is reversible error. *Id*.

viable defense based on entrapment which he had erroneously thought to be unavailable." Supp. Br. of Appellant at 4 n.1.[5]

*Chapman* dealt with a similar sting operation that led to attempted child rape charges and this court determined that the trial court erred in denying Chapman the opportunity to instruct the jury on entrapment. No. 50089-2-II, slip op. at 9-11. This court reasoned that the defendant had presented evidence that he had stopped talking to the fictional mother for two days and had declined to drive to meet her for an encounter with her children. No. 50089-2-II, slip op. at 9-11. The fictional mother reinitiated contact, and he only agreed to meet up after he asked the mother to promise he could have sex with her. *Chapman*, No. 50089-2-II, slip op. at 5-6. Because the defendant had presented evidence that he did not otherwise intend to commit the crime and was only induced by the promise of sex with the mother, he met his burden and was entitled to the entrapment jury instruction. *Chapman*, No. 50089-2-II, slip op. at 10-11.

The facts in *Chapman* are similar only in that Bertolacci also argued that his goal was to have sex with the mother, rather than the children. He testified that everything he said in the e-mail exchange with the detective was a lie. But he did not present any evidence, and there was nothing in the e-mail exchange to indicate that the fictitious mother was willing to engage in sex with Bertolacci. She repeatedly told him this was just for her kids, and she would not participate.

In *Racus*, the defendant was convicted of attempted rape of a child in the first degree after a nearly identical sting operation. 7 Wn. App. 2d at 291-96. Racus initially expressed interest in engaging in sex with the mother, but later expressly negotiated with the fictitious mother to engage in oral sex with her 12-year-old daughter. *Id*. at 294-96. Defendant's only argument that he was

---

[5] Both cases are unpublished and are thus only persuasive authority as we deem appropriate. GR 14.1(a). We note that *Racus* was published in part, but the holding regarding the entrapment instruction is found in the unpublished portion.

entitled to an entrapment instruction was that he originally said that "he didn't want to do anything illegal." *Racus*, No. 49755-7-II, slip op. at 19. This court reasoned that he reengaged in communications with the mother the next day despite the fact that she had told him that she only wanted the encounter for her minor children, and it concluded that the evidence showed that he was simply afforded the opportunity to commit the crime. *Racus*, No. 49755-7-II, slip op. at 19-20.

On appeal, Bertolacci also cites to *Arbogast*, which presented similar facts to *Chapman*. In that case, Arbogast answered a similar Craigslist add for a "mother" seeking sexual encounters for her young children. *Arbogast*, 15 Wn. App. 2d at 856. After finding out what was being offered, Arbogast stated that he did not know if he "could help do kids," but apparently retreated from that position when the detective, who was acting as the "mother," made clear that engaging in sex with the children was required in order to get together with her. *Id*. at 878. He eventually arrived at a predetermined location but did not bring the lube and condoms as requested. *Id*. at 862-63. In determining that Arbogast was entitled to an entrapment defense, the court first emphasized that Arbogast testified that he had never had sex with children or any interest in it, and he also had no prior criminal history, related or otherwise. *Id*. at 877. He also testified that he "had gone along when [the mother] disclosed what she was looking for to 'get on her good side' because he believed there was a possibility of having sex with her." *Id*. at 867. The court reasoned that the detective could have refrained from any suggestion that the "mother's" participation was a possibility but did not. *Id*. at 878. And finally, the court noted that Arbogast did not bring lubricant and condoms. *Id*.

Unlike in *Chapman* or *Arbogast*, Bertolacci was not entitled to the entrapment instruction because even under the "some credible evidence" standard, he failed to meet his burden of

20

production. At trial, although there was evidence that he otherwise had no predisposition toward children, Bertolacci did not present prima facie evidence that his resistance was overwhelmed by the conduct of the detective. Unlike in *Chapman*, there was no possible confusion here that Bertolacci's intent was to have sex with the "mother," rather than the children or as in *Arbogast*, that there was a possibility that the "mother" would be involved. Although the State need not prove a singular intent to have sex with the fictional children, to the exclusion of all others, the "mother" here nevertheless made it clear that she was not participating. The e-mail communications show that at all times, Bertolacci was the driving force behind his effort to further his criminal intent. After the "mother" clearly made her intentions known, he reengaged in communications, asked questions to specify the parameters of the criminal act, followed instruction on providing prophylactics in furtherance of the crimes, and drove to the agreed location. Even when viewed in the light most favorable to him, Bertolacci fails to meet his burden to provide some credible evidence that he was not simply afforded an opportunity to commit the crime and thus entitled to the instruction.

Because Bertolacci was not entitled to an instruction on entrapment, his counsel was not deficient in failing to request it. And because his counsel's performance was not deficient, he fails to show that he received ineffective assistance. Accordingly, the trial court did not abuse its discretion in denying Bertolacci's motion for new trial on this basis.

CONCLUSION

We conclude that there was sufficient evidence of Bertolacci's intent and of a substantial step to support the conviction for attempted rape of a child in the first degree. Also, because Bertolacci was not convicted of two crimes under the same criminal statute, no violation of the prohibition against double jeopardy occurred. We further conclude that Bertolacci did not receive

21

ineffective assistance of counsel because the two crimes do not constitute same criminal conduct. Finally, he failed to meet his burden of production to be entitled to an instruction on entrapment. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Glasgow, A.C.J.

Cruser, J.